**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 2:21-cr-132** |
| | ) | |
| **FRANCIS PHILLIPPI HARKER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS AND MOTION FOR A DOWNWARD VARIANCE

*You're so young, the world is your oyster. You haven't actually begun to sort of know the challenges that life is going to throw your way.*

### What are you so angry about?

This is part of the initial question posed to Cynthia Miller-Idriss, the director of Polarization and Extremism Research and Innovation Lab (PERIL) at American University, during a CBS News segment on online radicalization and extremism among young white men in America.[1] The Court could say the same to Francis Phillippi Harker.

Professor Miller-Idriss appeared on CBS News in the wake of the grocery store shooting in Buffalo, New York on May 14, 2022, and it's the context of the news segment that makes the facts of Mr. Harker's case concerning. Mr. Harker possessed firearms and other weapons, he was fascinated with white supremacist ideology and its shock value,

---

[1] CBS News, *What's driving young white men toward radicalization and white supremacist content?* (May 18, 2022), https://www.cbsnews.com/video/young-white-men-radicalization-white-supremacist-content/#x (last visited July 10, 2022).

he longed for acceptance, and he threatened violence in online communications. There is no denying or diminishing the facts of this case.

As Professor Miller-Idriss explained in the news segment, "[y]oung people, especially young white males, are susceptible to violent, hateful rhetoric online." She observed that certain young people "get online, they go into dark spaces. They're often sharing it in joke form, so it seems funny. It desensitizes them. It is a meme. It is a video clip. What are you reacting to. You're just a triggered snowflake. So they kind of get into this cycle and it opens up a lot of rabbit holes." That is what happened here. And Mr. Harker was more vulnerable to the online rhetoric for all the reasons cited by Professor Miller-Idriss:

> Young people in general are more susceptible to this kind of propaganda, although we have obviously seen adults be persuaded by misinformation, especially over the last couple of years. They're looking for a sense of belonging. They're looking for identity, meaning in their lives. And so a lot of times, we focus on the hatred and the negative sides. And we should, of course. But we lack an understanding of how this sense of belonging or brotherhood, even, and being a part of something bigger and better than themselves can bring them and pull them into it. So if kids are isolated, if they are anxious, and they are far away—and so we saw these kinds of things in COVID—from other adults who might notice red flags and warning signs, they're stuck in their rooms, they're online all the time, those kinds of things can draw them in.

In 2020, Mr. Harker was vulnerable and isolated in the way the professor described. But there was more to it than that. Mr. Harker also has Attention Deficit Hyperactivity Disorder (ADHD), suffers from depression, and was abusing drugs. *See* Exhibit 1 (sealed report of forensic neuropsychological evaluation performed by Jonathan

DeRight, Ph.D., ABPP). In other words, there are mitigating factors present here that aren't present in other cases and that can be addressed through treatment, medication, and monitoring. *Id.* Also, it is notable that "the 'shock value' and the prospect of social acceptance was a larger motivating factor for [Mr. Harker's] conduct than were ideological factors." *Id.* at 9. Finally, Mr. Harker acknowledges the wrongfulness of his conduct, accepts responsibility for the offense, and is amenable to treatment for both ADHD and his substance use.

On July 25, 2022, Mr. Harker will appear before this Court for sentencing after pleading guilty to possessing a firearm as an unlawful user of controlled substances. A sentence of three years in prison followed by a three-year term of supervised release is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). A three-year sentence properly accounts for the unique circumstances of this case including Mr. Harker's young age, the isolation he was experiencing at the time of the offense, his vulnerability to the Alternative-Right ideology and its influence, his unaddressed mental health condition(s), and his untreated drug addiction.

A three-year term of imprisonment is below the guideline range and Mr. Harker moves for a ten-month downward variance from the range to arrive at that sentence. As of Friday, July 8, 2022, there are no outstanding objections to the Presentence Investigation Report. The parties agree the applicable range is 46 to 57 months of imprisonment. Mr. Harker has no criminal history, and he will be affected by this federal felony conviction for the rest of his life. With proper mental health and drug treatment,

Mr. Harker's risk of recidivism is low. The fact of this prosecution, and its resulting conviction, are sufficient to deter Mr. Harker and others from engaging in this type of criminal behavior in the future.

Mr. Harker's letter to this Court is attached as Exhibit 2 to this pleading. It reflects his remorse for his actions and his interest in receiving treatment for ADHD and substance abuse. Letters from Mr. Harker's parents (Exhibits 3 and 4), and his aunt (Exhibit 5) are attached as evidence of the support he will have while he's incarcerated and when he is released.

I.     **A sentence of three years in prison and three years of supervised release is sufficient given the nature and circumstances of the offense and Mr. Harker's personal history and characteristics.**

It is within this Court's discretion to impose a below-guideline sentence. *See Gall v. United States*, 128 S. Ct. 586, 602 (2007) (finding a sentence outside the Guidelines to be reasonable); *see also Kimbrough v. United States*, 128 S. Ct. 570 (2007) (noting that courts may vary from Guideline ranges based solely on policy considerations, including disagreement with the Guidelines); *Rita v. United States,* 127 S. Ct. 2456, 2465 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California*, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer bound by the Guidelines, but are required to consider them along with the sentencing goals in 18 U.S.C. § 3553(a)). Time and again, the Supreme Court has reiterated that "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring). A sentencing

court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall,* 128 S. Ct. at 597. In this case, a sentence ten months below the guideline range is sufficient to accomplish the purposes of sentencing while taking into account the nature of the offense and Mr. Harker's personal history and characteristics.

A. *Though the offense is undoubtedly serious, a sentence of three years in prison plus supervision is sufficient to address Mr. Harker's criminal conduct.*

With any crime, there is always a continuum of behavior. Every violation of federal law is serious, but the gradients of the behavior are what ultimately dictate the necessary punishment. Here, as in most cases, the guidelines fail to account for the subtle gradients of this case.

The stipulated Statement of Facts set forth in paragraph six of the PSR details the offense conduct supporting Mr. Harker's plea.  In mid-2020, during the COVID-19 pandemic, Mr. Harker became active in alternative groups online. His social media postings and online discussions increasingly reflected an interest in matters not generally accepted in mainstream American society. Along with his social media activity, Mr. Harker traveled to meet with similarly minded persons, purchased firearms, and failed to disclose that he was a user of illicit controlled substances when doing so.

In April 2021, Mr. Harker came to the attention of the Federal Bureau of Investigation ("FBI"). On three occasions, Mr. Harker voluntarily participated in several hours of interviews at the FBI, and he confirmed the information known to the FBI at that time.  While the last interview was occurring, the FBI executed search warrants on Mr.

Harker's residence, car, person, and telephone.  Soon thereafter, a grand jury indicted Mr. Harker and law enforcement arrested him without incident.  He has been in custody since November 19, 2021.

On January 5, 2022, Mr. Harker notified the Court of his intent to accept the government's plea bargain, and he entered his guilty plea before Magistrate Judge Douglas E. Miller five days later.  PSR ¶ 2.  Sentencing is now scheduled for July 25, 2022, at which time Mr. Harker will request that this Court enter judgment of conviction and sentence him to no more than three years in the Bureau of Prisons.

When Mr. Harker participated in his PSR interview on January 31, 2022, he expressed remorse and regret.  PSR ¶ 16.  In his letter to this Court, Mr. Harker shares his thoughts on why he committed the offense and, more importantly, how he intends to improve himself as he serves a term of imprisonment and prepares for release in the future. *See* Exh. 2.

    B.  *Three years in prison is an appropriate sentence given Mr. Harker's history, his co-occurring mental illness and substance abuse, and his intelligence.*

Christopher and Rosemary Brown Harker welcomed their oldest child, Francis "Frank" Harker, at the beginning of this millennium while living in Savannah, Georgia. Within a few years, Mr. Harker was joined by his younger brother, Patrick Harker.  The two boys were fortunate to have both parents participate in their lives and work hard to support them. Christopher Harker is a naval architect for a private firm, and Rosemary Harker is a librarian at a local public middle school. Other than the typical conflicts

between children and parents, Mr. Harker enjoys a close relationship with his parents to this day.  PSR ¶ 39.

Mr. Harker's family members describe Mr. Harker as someone who always wanted to help others, whether that meant participating in boy scout activities, helping to pick up pecans, or shoveling snow, for example. Starting at the age of nine, he volunteered with the environmental group Lynnhaven Now cleaning up the river and surrounding areas.  This last activity inspired his family to become involved as well.

As a student at Tallwood High School, he ran on the cross-country team for a while and was nominated to the Model NATO program during his participation in the global studies academy. *See* Exh.  2-4. . Understandably, his parents are dismayed by what has occurred. They've questioned what signs they missed and hope they can continue to assist Mr. Harker as he moves through this process.

Mr. Harker sees himself very differently than his parents describe him. Not uncommonly, he is his own worst critic. First, he sees himself as being a bad big brother who constantly picked on his younger brother, causing their relationship to become distant. Mr. Harker feels a strong urge to repair his relationship with his brother. PSR ¶ 40. Having been bullied himself at a young age, it is through this lens that Mr. Harker continues to see the situation with his brother.  PSR ¶ 53.

Additionally, Mr. Harker believes that he was "lazy, wasted time, and was uninspired." PSR ¶ 41. When he was in middle school, he took advantage of his father's work travel by acting out. He continues to regret his behavior toward his mother for his actions, something which she has attributed to normal adolescent behavior.  PSR ¶ 42. As

Dr. DeRight explains in his report, these problems with self-esteem and self-concept are likely attributable to Mr. Harker's largely untreated ADHD. *See* Exh. 1 at 8.

Even though things seemed to be all right on the outside, Mr. Harker began to experiment with alcohol and illegal drugs in high school, specifically marijuana. This continued until he graduated from Tallwood High School in June 2018. PSR ¶¶ 55-56.

After high school, Mr. Harker found work, initially as a server and then as a manager at a local Mattress Firm store. The supervisor position lasted from January 2019 through February 2020 and ended with the onset of the COVID-19 pandemic. For the remainder of 2020, Mr. Harker had a few part-time jobs but nothing that lasted more than a few months. Finally, Mr. Harker obtained employment as an electrical apprentice, which is something he really enjoys. It appears that that work remains available to him upon release. PSR ¶ 61.

Mr. Harker also joined the Virginia National Guard in 2018, and he became active duty with the Guard for a period of time in 2020. By November 2021, Mr. Harker achieved the rank E-4, Specialist. Due to this offense, he was discharged, and Mr. Harker has much regret over this as well.

Over time, Mr. Harker experimented with many illegal substances until his primary drugs became synthetic hallucinogenic drugs like MDMA, LSD, and PCP. PSR ¶ 55. His drug use, along with his untreated ADHD, caused Mr. Harker to delve deeper and deeper into a fringe ideology and make increasingly warped decisions, culminating with the choices leading to this prosecution. In his report, Dr. DeRight describes Mr. Harker's drug use, his ADHD, and how both contributed to his commission of the instant

offense. *See* Exh. 1. Importantly, Mr. Harker is intelligent, capable, and motivated to obtain both mental health and substance abuse treatment. As Dr. DeRight notes, all of the recommended treatments "can be performed in the non-carceral setting, and [Mr. Harker's] opportunities for treatment would likely be better in the community." *Id.* at 9.

C. *Mr. Harker's youth should be considered mitigating.*

Sentencing Guideline §5H1.1 specifically provides that "[a]ge, **(including youth)** may be relevant in determining whether a departure is warranted, if considerations based on age, either individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1 (emphasis added). There is a body of research indicating that emotional, intellectual, and other cognitive development remain incomplete in late adolescence and early adulthood, suggesting that many young adults are more like adolescents than they are like adults even into their late twenties and older. Young adults show similar impairments of judgment, susceptibility to influence of peers, and impulsivity compared to adolescents, but young adults tend to have more independence, less structure and supervision, and more access to substances of abuse compared to teens.

Chronological age is a flawed proxy for developmental progress, a finding highlighted in studies of psychosocial maturity of adolescents and young adults. A September 2015 report from the National Institute of Justice (NIJ)[2] was unambiguous

---

[2] Schiraldi, V., Western, B., & Bradner, K., Community-Based Responses to Justice-Involved Young Adults. New Thinking in Community Corrections Bulletin. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 2015. NCJ 248900.

about the implications of psychological and criminology research for the justice system's response to criminal behavior in young adults:

> Whenever possible, young adults should be kept in the community… positive growth and behavior should be anticipated, and incentivized… **Incarceration is the most expensive and least effective sentencing option for young adults.** However, for cases in which incarceration is the final outcome, **sentence lengths should be shorter and more intensely rehabilitative**… Young inmates or parolees should be incentivized with "merit time" provisions that reduce their terms of incarceration or parole for participation in promising educational, vocational, or rehabilitative programs.

Mr. Harker was just 20 when he committed this offense. While most 20-year-olds do not make decisions as ill-advised as Mr. Harker's, almost all make bad decisions. And there is a reason for this: young brains are highly susceptible to the lure of "rewards,"[3] and, at the same time, they lack the development to adequately weigh rewards against risks, and do not possess the impulse control capacity of an adult to refrain from making high-risk, reward-seeking choices.[4] As the Supreme Court observed in *Miller v. Alabama,* young people "have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. 567 U.S. 460, 471, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012) (*quoting Roper v. Simmons*, 543 U.S. 551, 569 (2005)). They are also "'more vulnerable ... to negative influences and outside pressures,' including from their family and peers.'" *Id.*

---

[3] Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 Ann. Rev. of Clinical Psychol. 459, 466 (2009).
[4] B.J. Casey et al., *The Adolescent Brain*, 28 Developmental Rev. 62, 70 (2008).

The Supreme Court has held, based on "the evolving standards of decency that mark the progress of a maturing society," *Roper v. Simmons*, 543 U.S. 551, 561 (2005), that "youth matters in sentencing." *Jones v. Mississippi*, -- U.S. --, 141 S. Ct. 1307, 1314 (2021). "[I]n the exercise of [its] own independent judgment," the Court identified factors that distinguish juvenile offenders from adult offenders. *Roper*, 543 U.S. at 564. The *Roper* Court again relied on everyday experience, but it also cited recent developments in the psychological and sociological literature that helped explain adolescent impulsivity and the like. Contemporary neuroscience shows that such features of juvenile brains also extend to young adults, and therefore offenders between the ages of 18-21 may also be deserving of mitigation due to their youth for sentencing purposes. The Supreme Court has relied on factors distinguishing adults from adolescents. Those factors can be usefully grouped into four traits: youthful offenders' immaturity, susceptibility, salvageability, and dependence.

The first hallmark of adolescence that sentencing courts should consider is immaturity. The Supreme Court, as mentioned, has taken note of this simply as a matter of everyday experience. "A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Roper*, 543 U.S. at 569.

The Supreme Court has also mentioned a second "area of difference [between juveniles and adults] is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* Indeed, "[o]ne of the

hallmarks of adolescent risk taking is that it is much more likely than that of adults to occur in the presence of peers, as evidenced in studies of reckless driving, substance abuse, and crime."[5]

The Supreme Court has noted that a "third broad difference [between juveniles and adults] is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Roper*, 543 U.S. at 570. This "struggle to define their identity" decreases the likelihood "that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.*

Respected social science studies support this conclusion. "[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." *Id.* at 569. This includes crime. Indeed, based on "rigorous self-report studies," entirely "refrain[ing] from crime during adolescence" is "statistically aberrant."[6] On the other hand, "the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they mature [.]"[7]  This holds true even in especially severe cases. Even "most individuals identified as psychopaths at age 13 will not receive such a diagnosis" as adults.[8] Nor should judges believe that they can predict which offenders

---

[5] Jason Chein, *et al.*, *Peers Increase Adolescent Risk-Taking by Enhancing Activity in the Brain's Reward Circuitry*, 14 Dev. Sci. F1, F1 (2011) (citations omitted).

[6] Terrie Moffitt, *Adolescent-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy*, 100 Psych. Rev. 674, 685-86 (1993).

[7] Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009, 1014 (2003) [hereinafter Steinberg & Scott]

[8] Donald Lynam, *et al.*, *Longitudinal Evidence That Psychopathy Scores in Early Adolescence Predict Adult Psychopathy*, 116 J. Abnormal Psych. 155, 162 (2007).

will recidivate; even experts cannot reliably do so.[9]  For these reasons, when sentencing young offenders, judges should consider the chance that their youthful "character deficiencies will be reformed." *Graham v. Florida*, 560 U.S. 48, 68(2010).

Finally, the Supreme Court has explained that young offenders are less culpable because they have been dependent on others for most or all of their lives. Therefore, relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment. *Roper*, 543 U.S. at 569. ("[J]uveniles have less control, or less experience with control, over their own environment. '[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting.' ") (*quoting* Steinberg & Scott, *supra* note 8 at 1014) (cleaned up).

The cases cited above all stood for the principle that "children are constitutionally different for sentencing purposes."[10] Further, these cases were based upon an understanding of the science at the time that made it clear that juveniles had reduced culpability due to their "'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and headless risk-taking."[11] Also, young offenders deserve a less severe punishment because they "have a greater potential to reform than

---

[9] Edward Mulvey, *et al.*, *Trajectories of Desistance and Continuity in Antisocial Behavior Following Court Adjudication Among Serious Adolescent Offenders*, 22 Dev. & Psychopathology 453, 468, 470 (2010) (When a team of scholars attempted to model "trajectories of desistance and continuity" among adolescent offenders, they found that "even within a sample ... limited to those convicted of the most serious crimes, the percentage who continue to offend consistently at a high level is very small" and the ability to predict which offenders would do so is "exceedingly limited.").

[10] *Miller*, 567 U.S. at 470.

[11] *Id.* at 471 (quoting *Roper*, 543 U.S. at 569).

do adults."[12]  Contemporary neuroscience shows that such features of juvenile brains also extends to young adults, and therefore offenders between the ages of 18-21 may also be deserving of mitigation due to their youth for sentencing purposes. In some ways, young adults are more like adults, but importantly, new research shows that young adults are "more like adolescents in their behavior, psychological function, and brain development."[13]

For that reason, the period of adolescence can refer to the time period between childhood and adulthood, which can last from puberty into the late teens or early twenties.[14]  This period is a "distinct, yet transient, period of development…characterized by increased extermination and risk taking, a tendency to discount long-term consequences, and heightened sensitivity to peers and other social influences."[15]  The most important brain development during this time involves the prefrontal cortex and connections with other brain regions, which "plays a crucial role in advanced thinking abilities, including planning ahead and weighing risk and reward, and in self-regulation, including impulse control and the coordination of emotion and cognition."[16]

Research has found that young adult brains are more like juvenile brains than adult brains in many ways, such as in one study that found 19 to 21 year-olds are more

---

[12] Elizabeth S. Scott, Richard J. Bonnie, Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016) [hereinafter "Scott"]; see also *Miller*, 567 U.S. at 471.
[13] Scott, *supra* note 13 at 645.
[14] Nat'l Research Council, Comm. On Assessing Juvenile Justice Reform, *Reforming Juvenile Justice: A Developmental Approach* 18 (Richard J. Bonnie et al. eds., 2013).
[15] *Id.* at 1.
[16] Scott, *supra* note 13 at 651.

like teenagers with regard to impulsivity under emotionally arousing conditions.[17] Young adults are also similar to younger adolescents in their propensity to engage in risky behavior, including drinking, smoking, drug use, and criminal activity.[18] The inclination to risky behavior has long thought to be explained by hormonal changes that occur during puberty, and because brain development responsible for impulse control continues into the early twenties, a prolonged period of "vulnerability to risky behavior" exists in adolescents and young adults.[19]

The American Bar Association, in its Resolution 111, has accepted this research in support of its push to extend the prohibition on capital punishment to individuals 21 years or younger at the time of the offense, stating that "findings demonstrate that 18 to 21 year olds have a diminished capacity to understand the consequences of their actions and control their behavior in ways similar to youth under 18."[20]  Similarly, some scholars have suggested recognizing young adults, between the ages of 18 to 21, as a "transitional category between juveniles and older adult offenders."[21] The idea of such a transitional

---

[17] *Id.* at 642 (citing Alexandra O. Cohen et al., *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psychol. Sci. 549, 559-560 (2016)).

[18] Scott, *supra* note 13 at 642.

[19] *Id.* at 647.

[20]     American   Bar   Association   Resolution   111,   available   at https://www.americanbar.org/content/dam/aba/images/abanews/mym2018res/111 .pdf. (citing Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339, 343 (1992); Kathryn L. Modecki, *Addressing Gaps in the Maturity of Judgment Literature: Age Differences and Delinquency*, 32 L. & Hum. Behav. 78, 79 (2008) ("In general, the age curve shows crime rates escalating rapidly between ages 14 and 15, topping out between ages 16 and 20, and promptly deescalating.")).

[21] Scott, *supra* note 13 at 644.

category finds support from both the neuroscientific research and the fact that young adulthood in the United States has become a transitional period, where young adults are no longer viewed as fully independent at age nineteen. Instead, it is a high-stress transitional period in which "success or failure…can have a lifelong impact."[22] This transitional category would allow for mitigation in sentencing to account for the distinctions between a young adult and fully mature adult brain. Young adults, like juveniles, are also in a better position for reform as their brains continue to mature and reach full adult status and are therefore more deserving of mitigation.[23]

In sum, neuroscientific research shows that in many ways, young adult brains are more like those of adolescents than fully mature adults, as brain development and maturation continue into the early twenties. As such, young adults may be viewed as similarly less culpable and more likely to reform as juveniles. This research suggests that young adults should be treated as a transitional category, in which mitigation is appropriate for their age at the time of the offense.  Mr. Harker clearly falls into the category of research discussed above as he was only 20 years old when committing the instant offense.

How should courts' understanding of adolescence and adolescent cognition affect sentencing? First and foremost, Congress commands that a sentencing court "shall consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Then, the sentencing court "shall

---

[22] *Id.* at 654.
[23] *Id.* at 659.

impose a sentence sufficient, but not greater than necessary, to comply with" four purposes of sentencing. These purposes are just punishment, deterrence, incapacitation, and rehabilitation, and youth matters to each of them. *See Miller v. Alabama*, 567 U.S. 460, 472 (2012). ("[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.").

The need for just punishment corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 570. Thus, a just punishment for an adolescent is usually less severe than a just punishment for a similarly situated adult.

Youths' immaturity—particularly in the context of "hot cognition" decisions made in the presence of peers—also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment." *Miller*, 567 U.S. at 472.  The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain.

Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly

situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

For all these reasons, to impose a sentence that is "sufficient, but not greater than necessary," sentencing courts should generally impose lesser sentences on youthful offenders than on similarly situated adult offenders. And this also means that courts cannot simply treat anyone over 18 as an "adult" for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent. In many respects, Mr. Harker was functioning more as an adolescent than an adult. His youth, especially in conjunction with his ADHD and other mental health and substance abuse issues, contributed to his commission of the offense and should be considered mitigating.

## II.   A three-year term of imprisonment with supervision to follow is sufficient but not greater than necessary to satisfy the purposes of sentencing in this case.

A three-year term of imprisonment plus supervision is a substantial deprivation of Mr. Harker's liberty and constitutes just punishment. This prosecution has had an impact already and a below-guideline sentence of three years will not diminish the seriousness of the offense. As the court observed in *United States v. Matteo,* 299 F. Supp.2d 201, 209-210 (S.D. N.Y. 2004):

> [T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and

career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.

Mr. Harker's life is forever changed by the crime he committed at age 20. He will be a felon and always excluded from central pillars of American civic and social life as a result. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (documenting the "broad range of collateral consequences that serve no function other than to further punish criminal defendants after they have completed their court-imposed sentences" and describing how being branded as a felon is a form of "civil death" that "send[s] the unequivocal message that 'they' are no longer part of us"); *see also* U.S. Dept. of Justice, Office of the Pardon Attorney, *Statutes Imposing Collateral Consequences upon Conviction* (Nov. 16, 2003), *available at* http://www.justice.gov/pardon/collateral_consequences.pdf (last visited July 11, 2022);[24] *United States v. Gardellin*i, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that the defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis…").

Moreover, a sentence of three years in prison with a term of supervision will deter Mr. Harker and others from future criminal conduct. Mr. Harker was caught, prosecuted,

---

[24]  This publication describes the federal consequences of convictions on an individual's "ability to vote; serve on federal jury; hold federal office, federal employment or certain federally-issued licenses; serve in armed forces; participate in federal contracts or programs; receive federal benefits; become a U.S. citizen or remain in the U.S.; and live free from registration or community notification requirements.

and now faces sentencing. He knows that if he engages in the same behavior in the future, he'll be caught and will face even more time in prison. Especially for someone like Mr. Harker with no criminal history, the certainty of punishment is enough to achieve deterrence. "[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013). Simply put, the facts of this case make clear that a lengthy term of imprisonment is not the best way of keeping the community safe. National Institute of Corrections, *Myths and Facts: Why Incarceration is Not the Best Way to Keep Communities Safe* 6 (2016), https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf. Because "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime,"[25] general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid."[26]  In the end, what's needed to deter others from getting into the same "cycle" online as Mr. Harker, opening up Alternative Right ("Alt-right")[27] "rabbit holes," becoming fascinated with the shock value of that ideology, and then acting on it is  *significant* policy change, as Professor Cynthia Miller-Idriss

---

[25] Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted).

[26] *Id.* at 1205.

[27] Anti-Defamation League, *Alt-Right: A Primer on the New White Supremacy* (Feb. 10, 2016), https://www.adl.org/resources/backgrounder/alt-right-primer-new-white-supremacy (last visited July 11, 2021).

described in the CBS News segment cited above. Incarcerating Mr. Harker for the amount of time suggested by the guidelines—4 to 6 years—isn't what will make the difference in preventing future acts by Alt-right influenced youth.

As for Mr. Harker, he needs effective mental health and substance abuse treatment for a number of reasons, including that it will help eliminate any minimal risk of recidivism by addressing *why* he committed the instant offense. *See* Exh. 1. Research confirms that mental health treatment, and specifically cognitive behavioral skill-building, is more effective in reducing future criminal behavior than punishment even among persons at high-risk of reoffending. Patricia Clark, Office of Justice Programs, National Institute of Justice, *Preventing Future Crime with Cognitive Behavioral Therapy*, 265 Nat'l Instit. of Just. J 22 (2010). The community, after a term of imprisonment, is the best place for Mr. Harker to engage in treatment. *See* Exh. 1.[28]  The law is clear that prison is not a means of providing treatment. *Tapia v. United States*, 564 U.S. 319 (2011); 28 U.S.C. § 994(k) ("The Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.").

---

[28] *See also* Kimberly Wiebrecht, *Evidence-Based Practices and Criminal Defense: Opportunities, Challenges, and Practical Considerations* 8 (2008), *available at* http://nicic.gov/library/files/023356.pdf ("[t]he research...states that treatment interventions are more effective when provided to defendants while they are in the community rather than in an institutional setting.")

A lengthy period of incarceration is not necessary to achieve the goals of rehabilitation and deterrence in this case.  In fact, courts have found that incarceration can seriously undermine a defendant's rehabilitation because meaningful opportunities to receive mental health treatment and counseling are more often found in the community, rather than in prison. *See United States v. Crespo-Rios*, 2015 WL 6394256, Crim. No. 08-208, at *3 (D. Puerto Rico Oct. 19, 2015). This is particularly salient here, where Mr. Harker's isolation and difficulty forming social relationships contributed to the commission of the offense. He will always be a felon and he will have served time in prison—two isolating factors—but cognitive-behavioral therapy and other treatment will help Mr. Harker address these and other challenges in a prosocial manner.

## CONCLUSION

For Francis "Frank" Harker, a young man with no prior criminal history and a promising future, a sentence of three years in prison is sufficient. We ask the Court to vary downward ten months from the advisory guideline range to impose a sentence of three years plus a term of supervision.

Respectfully submitted,

FRANCIS PHILLIPPI HARKER

By _____/s/_____
Keith Loren Kimball
Virginia State Bar No. 31046
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Assistant Federal Public Defenders
Attorneys for Francis Phillippi Harker
Office of the Federal Public Defender
150 Boush Street, Suite 403

Norfolk, Virginia 23510
Telephone:  (757) 457-0800
Telefax: (757) 457-08880
Email:  keith_kimball@fd.org
         suzanne.katchmar@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2022, I filed this pleading with the

Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to all counsel of record.

I further certify that I have sent a copy of this pleading, via electronic mail, to:

Latriston Cox
United States Probation Officer
Email:  Latriston_Cox@vaep.uscourts.gov

_____/s/_____
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Assistant Federal Public Defender
Attorney for Francis Phillippi Harker
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone:  (757) 457-0890
Facsimile:  (757) 457-0880
Email: suzanne_katchmar@fd.org